Trevorton Anthracite Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued February 9, 1979, before Judges Rogers, Blatt and DiSalle, sitting as a panel of three.

*Sanford S. Marateck,* with him *Frank J. Konopka,* and *Lark, Makowski, Marateck & Konopka,* for appellant.

*John P. Krill, Jr.,* Assistant Attorney General, for appellee.

Opinion by Judge DiSalle, April 18, 1979:

Trevorton Anthracite Company (Trevorton) has appealed an order of the Environmental Hearing Board (Board) which assessed civil penalties on Trevorton for three violations of The Clean Streams Law (Law), Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.1 et seq.

Trevorton owns and operates an anthracite coal washery. On November 27, 1963, the Department of Health issued an industrial waste permit to Trevorton for the construction and operation of waste treatment facilities. The purpose of these facilities was

to collect water used in the washery in a sump and then pump it into a large settling basin or slush pond so that suspended solids could settle out of the water prior to its discharge into a stream.[1]

To effectuate this purpose, Trevorton constructed a large settling lagoon or silt dam approximately eight acres in size. Three overflow weir boxes[2] were constructed in the berm of the settling lagoon to permit the gradual decanting of treated water into the stream. These boxes were expressly designed to minimize the discharge of suspended solids.[3]

In the course of continuous usage, two of the three overflow weir boxes became blocked. To overcome this blockage, Trevorton, in June of 1974, installed a four inch overflow pipe near the location of one of the boxes. Trevorton admits that from the date of installation until December 10, 1975, the pipe was opened a maximum of seven times. On February 25, 1975, and again on December 9, 1975, a representative of the Department of Environmental Resources (Department) observed the overflow pipe in use. Thereafter, the Department filed a complaint against Trevorton seeking assessment of civil penalties for various violations of the Law. The Board found that Trevorton violated Sections 307 and 308 of the Law,

---

[1] Trevorton's waste permit specifically referred to the purpose of the waste treatment facilities as being the primary treatment of effluent water—i.e., the removal of practically all settleable solids therefrom.

[2] These boxes are three feet long and open at opposite ends. The side of the box nearest the stream consists of a wooden slat approximately two inches below the surface of the water in the lagoon.

[3] Trevorton's waste permit contained a specific condition which pertinently provided as follows: "The design of the overflow device or devices shall provide such length of weir as will insure velocities of approach low enough to permit removal of the clarified water with the minimum outflow of suspended solids."

35 P.S. §§691.307 and 691.308,[4] and imposed penalties totalling $5,700.00 therefor.[5]

Trevorton raises two questions for consideration on appeal: (1) whether the Board was correct in assessing a penalty for the February 25th violation; and (2) whether the civil penalties imposed were excessive considering the nature and extent of the viola-

---

[4] Section 307 pertinently provides as follows:

No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the board or such person or municipality has first obtained a permit from the department. . . . A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the board is hereby declared to be a nuisance.

Section 308 provides as follows:

All plans, designs, and relevant data for the erection and construction of treatment works by any person or municipality for the treatment of industrial wastes shall be submitted to the department for its approval before the works are constructed or erected. Any such construction or erection which has not been approved by the department by written permit, or any treatment works not maintained or operated in accordance with the rules and regulations of the board, is hereby declared to be a nuisance.

[5] Specifically, the Board concluded that the discharges of industrial wastes through the overflow pipe on February 25, 1974, and December 19, 1975, were unauthorized by permit and thereby violative of Section 307. The Board imposed a $200.00 penalty for the February 25th violation and a $500.00 penalty for the December 9th violation. The erection of the overflow pipe in the first instance was also found to be unauthorized by permit and thereby violative of Section 308. The Board imposed a $5,000.00 penalty for the violation after having expressly considered the wilfulness thereof as well as the deterrent effect such a penalty would have on Trevorton and others similarly situated. These civil penalties were assessed pursuant to Section 605 of the Law, 35 P.S. §691.605, which, prior to the 1976 amendments, read, in part, as follows:

tions charged. With regard to the first issue, Trevorton's sole argument is that the finding of a violation for the February 25th discharge is precluded in the absence of laboratory tests establishing that the quality of the water upstream of Trevorton's plant exceeded the quality of the water discharged from the settling lagoon. With regard to the second issue, Trevorton first contends that the substitution of an overflow pipe for the blocked weir box was not a "substantial" deviation from its permit and was not a violation thereof. Trevorton also contends that the Board abused its discretion in imposing large civil penalties since the violations involved in the instant case were isolated in nature and involved mere technical oversight, and since the source of the violations has since been removed. The sole authority cited to support this argument is *Department of Environmental Resources v. Mill Service, Inc.*, 21 Pa. Commonwealth Ct. 642, 347 A.2d 503 (1975) (hereinafter cited as *Mill Service*).

Turning to Trevorton's argument that the February 25th violation cannot stand in the absence of an actual finding as to the quality of the water discharged, it is clear that such a determination is unnecessary to establish a violation of Section 307. The

---

In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, or a rule, or regulation, of the board or an order of the department, the board after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was wilful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) plus five hundred dollars ($500) for each day of continued violation. In determining the amount of the civil penalty the board shall consider the wilfullness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost of restoration, and other relevant factors.

February 25th violation was predicated on a finding that the discharge was unauthorized by permit. Evidence in the record indicates that Trevorton acquired no new permit authorizing discharge through an overflow pipe and that such a means of discharge obviously conflicted with Trevorton's existing waste treatment permit. Once the water discharged from Trevorton's plant was determined to be industrial waste,[6] a violation of Section 307 could be found irrespective of the actual quality of that water.

Trevorton argues that the overflow pipe performed essentially the same function as the overflow weir boxes. It is undisputed that the whole purpose of the overflow weir boxes was to minimize the discharge of suspended solids into the neighboring stream, *see supra* note 3, and that they did, in fact, achieve this purpose in a satisfactory fashion. The Board, in comparing the respective functions of the overflow weir box and the overflow pipe, made the following finding of fact:

18. Trevorton's siphon pipe was not an 'overflow device' or 'weir' within the meaning of Trevorton's permit, because it required priming, sucked in water under pressure, had its intake point at least a foot below the surface of the water in the basin, and did not provide any 'length of weir' to insure a low approach velocity of the water. Because the intake point of

---

[6] Section 1 of the Law, 35 P.S. §691.1, defines industrial waste to include

any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations. 'Industrial waste' shall include all such substances *whether or not generally characterized as waste.* (Emphasis added.)

the siphon pipe was located at least one foot below the surface of the water, the pipe would tend to entrain and discharge suspended solids that were in the process of settling down past the pipe.

Looking to the record, we are well satisfied that substantial evidence supports this finding. Hence, we believe that the Board was justified in determining that the overflow pipe differed sufficiently from the overflow weir box in nature and function as to warrant a conclusion that the construction of the pipe was unauthorized by permit and thereby violative of Section 308 of the Law.

Trevorton's final argument, raised with reference to the imposition of civil penalties is, of course, that the Board abused its discretion by assessing penalties far in excess of those warranted by the circumstances. The sole authority cited in support of this argument is the *Mill Service* decision, which, it contends, is so factually similar to the instant case as to mandate imposition, at most, of essentially *de minimis* civil penalties.

In *Mill Service,* this Court found that the Board abused its discretion by *revoking* a waste disposal permit on the basis of a single violation of the Law, a violation which also involved the discharge of industrial waste through a pipe. We reasoned that revocation of the permit was an excessive penalty since the violation was isolated in nature, the condition giving rise to the violation was expeditiously corrected, the Board's adjudication only supported a mere suspicion that the violation was wilful, and since the Board actually *admitted* in its decision that a civil or criminal penalty would have been a far more appropriate sanction than revocation.

Having carefully considered Trevorton's argument and the record in this case, we believe that Trevor-

ton's reliance on *Mill Service* is wholly misplaced. The case is distinguishable from the instant action not only because *Mill Service* was not a civil penalty case (rather it involved review of the more serious penalty of permit revocation), but also because the Board here was unanimous in its judgment that some degree of civil penalty was warranted. More importantly, the record reveals, and Trevorton admits, that the overflow pipe, the construction of which gave rise to the most substantial penalty, existed for 1½ years, during which time it was opened a maximum of seven times to permit the discharge of water from the settling lagoons. Further, on at least two such occasions, a representative of the Department actually observed the pipe in use. On the first such occasion, the Department representative testified that he informed Trevorton that the use of the overflow pipe in the fashion observed was violative of the Law and that any reoccurrence would warrant legal action.[7] We do not believe, therefore, that the *Mill Service* decision is in any way determinative of the present case.

While we may have been inclined to reach a different result with respect to the amount of civil penalties imposed, we are not at liberty to substitute our judgment for the Board's. *United States Steel Corp. v. Department of Environmental Resources,* 7 Pa. Commonwealth Ct. 429, 300 A.2d 508 (1973). Rather, our role is limited to a determination of whether the penalties were fashioned to reasonably ''fit'' the vio-

---

[7] An employee of Trevorton testified that on February 27, 1975, a Department representative advised him that future discharges of unclear or discolored water through the overflow pipe would warrant some unspecified legal action. This same Trevorton employee nevertheless testified that on December 9, 1975, "cloudy" water was, in fact, discharged from the pipe in the presence of the same Department official.

92

lations. Trevorton has made no argument, beyond the reference to *Mill Service,* that even suggests that the penalties imposed were unreasonable. The Board, in its adjudication, spelled out the basis for each of the penalties imposed. Indeed, with regard to the most severe penalty, the Board went to considerable length to indicate its reasoning, citing the wilfullness of the violation as well as the deterrent value a substantial penalty—but one well within the statutory limit—would have on Trevorton and others similarly situated. In the absence of any specific reason why these factors were inappropriate or improperly considered, we cannot say that the Board abused its discretion. We will affirm the Board's adjudication.

ORDER

AND Now, this 18th day of April, 1979, the order of the Environmental Hearing Board dated January 24, 1978, assessing civil penalties on Trevorton Anthracite Company, is hereby affirmed.